# United States Court of Appeals
## For the First Circuit

No. 05-1327

UNITED STATES,

Appellee,

v.

RONALD A. CHARLES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor,  U.S. District Judge]

Before

Howard, Circuit Judge,

Coffin and Campbell, Senior Circuit Judges.

Christopher R. Goddu for appellant.
Todd E. Newhouse, Assistant U.S. Attorney with whom Michael
J. Sullivan, United States Attorney, and Virginia M Vander Jagt,
Assistant U.S. Attorney, were on brief for appellee.

August 3, 2006

**CAMPBELL**, <u>Senior Circuit Judge</u>.  Ronald Charles appeals from his conviction for assault on a federal officer in violation of 18 U.S.C. § 111 after a jury trial in the United States District Court for the District of Massachusetts.  He makes two claims: (1) that the district court erred in allowing the admission of evidence related to Charles's possession of drugs and (2) that the district court erred in allowing the government's case agent, who was allegedly also a victim of the assault, to sit at the government's counsel table.

### Background and Facts

We state the facts in the light most favorable to the jury verdict, consistent with record support.  <u>United States</u> v. <u>Nash</u>, 130 F.3d 490, 493 (1st Cir. 1997).  On August 4, 2003, two agents from the Drug Enforcement Agency ("DEA"), John Barron and Jonathan Shankweiler, were conducting surveillance of an individual in Springfield, Massachusetts.  Driving separately in unmarked cars, they lost the targeted car.  The two agents pulled into a parking lot at a Walgreens, where they waited, hoping the target would reappear.  The area, Mason Square, was known by the agents as a site of drug-trafficking and violent crime.  While the agents waited, they observed several people in a ten-minute time span pull up in vehicles, park, signal to one another, get out, and walk across the four lanes of the street to the River Inn Motel.  The individuals would return to their cars within a minute to a minute

-2-

and a half and drive away.  Barron surmised that retail drug dealing was in progress.

Deciding to investigate, the agents drove to the River Inn Motel, where they parked.  As the agents were operating undercover, they were wearing polo shirts and jeans, but had guns and badges at their waists.  The agents saw two men on the second-floor balcony "taking a real hard look at [the agents] as [they] were pulling into the parking lot."  Barron told his partner to cover his badge, which both agents did with their shirts.  Barron entered the building's stairwell first, followed by Shankweiler.  Once they were inside, the agents tucked their shirts back in to make the badges and guns "clearly visible."

Charles was standing on the second-floor landing of the stairwell.  He had a plastic baggie in his hands, and "he was concentrating very intently on it."  Barron concluded the baggie was "consistent with crack cocaine packaged in a retail distribution amount."  Charles was trying to tie the baggie; "[h]e was just really, really concentrating on it" and did not see Barron until the agent was about four to six feet away.  Barron concluded at that point that there was probable cause to arrest Charles, so Barron announced, "Stop.  Police."  Charles, however, looked at the agents and ran away from them, up the stairs to his left.  Barron reached for Charles's shirt and arm and told him, "Stop.  Police," several times.  Charles then changed direction and tried to come

back down the stairs between the agents and in so doing pulled them over the landing.  The agents spent about a minute in the stairwell trying to gain control of Charles, who was "flailing his arms, flailing his feet, trying to pull [the agents] down the stairs." He was "using the railing . . . with one arm trying to pull away from [the agents], whacking [their] arms, chest, head, torso, whatever he could with his arms flailing trying to get away." Charles managed to make contact with most of the agents' upper bodies, arms, shoulders, and heads.  Shankweiler also yelled, "Stop.  Police," multiple times.  Barron struck Charles on the arms, leg, neck, and face during the struggle, trying to make him release the railing.  Charles dropped the baggie he had been trying to tie.  The agents eventually "got a little bit more control of" Charles and brought him from the stairs onto the landing, although Charles was still fighting.  The three "spilled out to the doorway to the left in the hallway," where Charles continued to resist.

Once the struggle had moved into the hallway, bystanders began gathering and were "starting to be pretty verbally abusive" to the agents.  Charles was yelling, "Help me.  Help me.  These guys are hurting me."  The agents said "Police" several times in the hallway.  They started to get control of Charles, when he suddenly jumped back up.  Barron testified that "as [Charles] came back up, one of his hands reached up and grabbed me and my side, on the side I hold my firearm."  Barron explained his fear: "My

concern was that if the gun came out, myself, my partner, possibly Mr. Charles, if my partner observed that gun, would be killed." As a result of this concern, Barron dealt Charles a blow with his knee, which broke Charles's nose. Charles let go of the holster and then rolled on the ground with his hands underneath him, refusing to comply with the agents' orders to show his hands. Shankweiler, concerned that Charles might have a gun in his waistband, sought to reach Charles's hands.

The struggle lasted about seven minutes. Once Charles was sufficiently under control, Shankweiler left to search for the baggie Charles had dropped but was unable to find it. Shankweiler called the Springfield police for help since Charles was still struggling to get up. The police arrived; they first helped to control the crowd and then assisted the agents in handcuffing Charles. At trial, the government played for the jury a motel video surveillance tape taken during the events; the initial encounter in the stairwell was not, however, visible in the video.

Springfield police took Charles to the police station, where Shankweiler and DEA Special Agent James Clifford read Charles the Miranda warnings. When Shankweiler asked Charles, "do you understand," after the warnings, Charles said, "what [the agents] did was uncalled for. I was just resisting."

In the process of booking Charles, police found in his pocket a plastic baggie, which contained traces of crack cocaine.

Charles was subsequently transported to the hospital for treatment of his nose. The next day, Barron awoke with a "decent size" bruise on his arm.

On July 24, 2004, a federal grand jury returned a superceding indictment charging Charles with two counts of assault on a federal officer, in violation of 18 U.S.C. § 111: one count of assault with physical contact and bodily injury of Barron, see 18 U.S.C. § 111(b), and one count of assault with physical contact of Shankweiler, see 18 U.S.C. § 111(a)(1). On July 30, 2004, the government filed a motion in limine to admit evidence (the plastic baggie seized from Charles) pursuant to Fed. R. Evid. 404(b). The district court granted the motion by endorsed order over Charles's objection, stating at the hearing on the motion:

> If Mr. Charles had drugs on him, that is an explanation for why he would be fighting to not be taken into custody. And so it seems to me that the issue of whether Mr. Charles was in possession of drugs at the time comes into the case to allow the government to argue that this fellow was not defending himself from any assault. He . . . has a bag in his possession which had cocaine residue in it, and . . . that shows that he was doing exactly what the officer said he was doing, A. And, B, it also shows that he wasn't defending himself . . . .
>
> So I don't see -- I'm unhappy with the idea of putting the bag in because there is a risk that the jurors will say, well, this guy is a jerk. He's selling drugs. The heck with him. We'll find him guilty of anything the government wants us to find him guilty of because he's a bad person and he's selling drugs, and that's not a proper use of the evidence.
>
> But on the other hand, there is a quite proper use of the evidence for the government to show what was really going on here and was this really likely to have been simply a

-6-

case of some out-of-control police officers attacking someone? Or was it a case of an individual who was caught and was doing everything he could do to tear himself out of the grasp of the officers and bolt out of there?

The court disagreed with Charles's claim that unfair prejudice outweighed probative value, saying: "I think the unfair prejudice is fairly minimal and I think the probative value is fairly great." The court subsequently gave a detailed limiting instruction when the government introduced the baggie at trial:

[Charles is] not charged with any drug-related offense at all.

I'm only letting the evidence with regard to what the government perceived was going on that evening to come before you to give you context as to what was going on, and you may use the evidence to the extent that you find it helpful in determining the issues relating to the assault charges.

But the mere fact that the defendant was involved in some kind of drug distribution, if he was, does not necessarily mean that he assaulted the officers. And you should not assume simply because you may find that he was involved in this activity that he necessarily committed the assaults . . . .

I do believe that it's appropriate for you to have an idea of what the context was at least as the government perceives it and so you may consider the evidence solely for that purpose and that's the reason that I'm allowing this evidence to be put before you.

Charles also objected pretrial to Barron's sitting at the counsel table during trial in his role as case agent and asked the district court to sequester him like any other witness. The government stated that it would put Barron on the stand first and then ask him to remain at counsel table. The court considered the

issue and ruled on August 23, 2004 that Barron could sit at counsel table. The court stated:

> There was one issue with regard to Special Agent Barron who's the case agent. I don't see any prejudice with having him sit at counsel table especially if he's going to be testifying first. He was here for the entire suppression hearing. He heard testimony. He's familiar with the case.
>
> I just don't see any prejudice. The defendant will be here in the courtroom. I think there's some balance there. So I'm going to deny defendant's motion to sequester the case agent, Special Agent Barron. All other witnesses in the case will remain outside the courtroom until it's time for them to testify.

During the voir dire, the court questioned the potential jurors about possible bias in favor of law enforcement witnesses. The court instructed the potential jurors that "you should not give the law enforcement officer's testimony any more weight or any less weight just because the person happens to be a law enforcement officer." The judge later reiterated similar instructions about the importance of treating government agent testimony in the same manner as the testimony of others before the jury left for deliberations. A jury trial began on August 23, 2004.

At trial, Charles defended himself on the theory that he was surprised by two unidentified white men in the stairwell of the River Inn Motel and defended himself against an assault by these two men. Charles put on three witnesses. Hermant Patel, the hotel manager, testified that the agents walked by his office before entering the motel stairwell. When he asked the officers if he

could help them, they showed him their badges. Patel did not see any of the struggle from his office, but he heard loud, indistinct talking.

Amber Stone, a friend of Charles, also testified. She lived at the motel and was sitting on a balcony during the incident. She observed the agents arrive in the parking lot. While she did not see firearms or badges, she testified that "[i]t was obvious" they were police because she had "seen them there at the River Inn about every day so they looked like police to [her]." She added, "I know that he -- that Ronald Charles already knew that they were police." Stone did not see the encounter in the stairwell or hear the agents identify themselves until later, but she did see Charles on the second-floor hallway. She testified that one of the officers hit Charles with a fist or elbow, and Charles "was just standing there."

Charles's aunt, Ulcinea Vaz, also testified. She was living on the third floor of the River Inn Motel and was in her room on the day in question. She did not see the stairwell encounter, but she heard "a whole bunch of noise and . . . heard Ronald [Charles] yelling, 'Auntie Chumby, help me.'" She went down a flight of stairs and "saw two police officers beating up Ronald Charles." She knew they were police. She testified that when she asked them why they were fighting with Charles, the agents replied, "because we are trying to get some drugs." She said the agents

told her Charles was resisting arrest, and she replied, "How could he resist arrest and both of you are on him?"  She testified she was not sure whether she saw the agents' firearms and badges.

The court instructed the jury not only on the charges in the indictment but also on the lesser included offenses of assault with physical contact or simple assault.  The elements of the charged crime included the requirement that "at the time of the assault [the agents were] engaged in the performance of [their] official duties as . . . special agent[s] of the Drug Enforcement Administration."  The court also instructed the jury on self-defense:

> If the defendant knew of the official identity or purpose of John Barron, and Mr. Barron used only reasonable force to carry out his purpose, then the defendant has no valid claim of self-defense.  A person has no right to resist arrest, even if it turns out that the arrest was unlawful, if the person is aware of the official identity and purpose of the arresting officer and the officer does not use unreasonable force.
>
> If, on the other hand, you find that the defendant had no knowledge of the official identity or purpose of John Barron, and that the defendant reasonably believed that he was the subject of a hostile and imminent attack against his person by John Barron, then the defendant was entitled to use reasonable force to defend himself.

The court instructed that the burden was on the government "to prove beyond a reasonable doubt that the defendant did not act in self-defense."

Charles argued to the jury that he was acting in self-defense and that the officers used unreasonable force.  He argued

-10-

that the officers were not performing their official duties but "were on a lark of their own." He attacked the agents' investigative procedures and credibility and argued that the only one to have seen Charles with the baggie of crack was Agent Barron. He also argued that Barron's bruise did not constitute a bodily injury.

The jury returned its verdict on August 26, 2004, finding Charles guilty of two counts involving physical contact against the officers in violation of 18 U.S.C. § 111(a)(1). It found him not guilty of the greater offense of assault resulting in bodily injury. On February 24, 2005, the court entered judgment, sentencing Charles as a career offender to 54 months in prison and three years' supervised release. Charles does not contest his sentence as such.

**Discussion**

On appeal, Charles argues that the district court erred in allowing into evidence the testimony and evidence concerning his possession of drugs, on the grounds that the evidence was not relevant and was excessively prejudicial. The government responds that the evidence was admissible as part of the narrative of the incident and was relevant both to establish the charged offenses and to assess Charles's contention that he was acting in self-defense, unaware that the agents were law enforcement agents. The

government further argues that the court's limiting instruction adequately addressed the risk of unfair prejudice.

Charles argues additionally that it was a violation of both Fed. R. Evid. 615 and his constitutional right to due process to allow Barron, the case agent and victim in the case, to sit at counsel table with the government's attorney. The government responds that there was no error because Rule 615 permits a case agent to sit at counsel table, and crime victims have a statutory right not to be excluded from the courtroom. Further, Charles cannot show that he was prejudiced by Barron's presence because Barron testified first, the court instructed the jury that law enforcement testimony should not receive special deference, and the government did not use Barron to make an improper appeal to emotion.

We affirm Charles's conviction.

## A. Admissibility of Evidence Relating to Drug Use

This Court reviews preserved challenges to a district court's evidentiary rulings regarding relevance and unfair prejudice for abuse of discretion. United States v. Richardson, 421 F.3d 17, 38-39 (1st Cir. 2005). Our review of the admission of testimony not objected to at trial is for plain error. United States v. Medina, 427 F.3d 88, 91 (1st Cir. 2005).

Here, Barron's testimony that before the arrest he saw Charles concentrating upon and trying to tie a baggie "consistent

with crack cocaine packaged in a retail distribution amount" was not objected to, hence its admission is reviewable on appeal only for plain error. Evidence that, subsequently, after the arrest, Charles was found to possess a baggie with traces of crack cocaine was objected to. Hence we review the admission of the later evidence under an abuse of discretion standard. Because, however, both pieces of evidence clear the discretionary hurdle, we need not tarry over the easier question of whether admission of Barron's unobjected-to testimony amounted to plain error, which it clearly did not.

Charles argues that evidence he possessed drugs was not relevant to the elements of the crime for which he was accused. To commit a violation of 18 U.S.C. § 111(a), the defendant must (1) forcibly; (2) assault, resist, oppose, impede, intimidate, or interfere with; (3) a designated federal officer; (4) while engaged in or on account of the performance of official duties. In addition, the defendant must (5) have the intent to do the acts specified. See United States v. Arrington, 309 F.3d 40, 44 (D.C. Cir. 2002). Charles points out that the court instructed the jury that a person is not allowed to resist arrest, regardless of whether the arrest is lawful or unlawful. This shows, he says, the irrelevance of evidence of Charles's involvement in illegal drug activity. The government responds that the evidence was highly relevant and not overly prejudicial, both because it went to

proving an element of the crime (that the officers were performing their official duties in arresting Charles when they were attacked) and because it tended to disprove Charles's argument that, in violently resisting, he was simply acting in self-defense. The district court had instructed the jury that the drug possession evidence went only to the agents' belief that drug distribution was going on, not to any demonstration of inherent guilt on Charles's part.

### i. Admissibility Under Fed. R. Evid. 401

As noted, Charles argues that the drug evidence was improperly admitted because it was not relevant to the case at hand. Relevant evidence is defined as

> evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed. R. Evid. 401. "Evidence that pertains 'to a chain of events forming the context . . . and set-up of the crime, helping it to complete the story of the crime on trial . . . [is admissible in appropriate cases] . . . where it possesse[s] contextual significance.'" United States v. Sabetta, 373 F.3d 75, 83 (1st Cir. 2004) (quoting United States v. Ladd, 885 F.2d 954, 959 (1st Cir. 1989)). In Sabetta, this Court upheld the admissibility of statements by a friend of the defendant who had wanted to use the defendant's gun as relevant to the issue of whether the defendant had been in possession of a firearm. The defendant argued that the

-14-

fact that his friend wanted to use the gun had no relevance to whether the defendant possessed a gun. The district court found it relevant, writing, "It's all part of the whole procedure that was taking place." Sabetta, 373 F.3d at 83. Here, Barron's testimony that he saw Charles trying to tie the baggie forms a part of the agents' explanation of why they approached Charles and why they undertook to arrest him. It is, moreover, directly relevant to one element of the crime, i.e., that the officers were acting in their official capacity. The evidence of the later discovery of the crack-dusted baggie on Charles's person corroborates the officers' observations, and it also undercuts Charles's argument that during the altercation he was acting only in self-defense rather than trying to avoid arrest for possession of drugs. Thus we hold that both the earlier testimony furnished by Barron and the post-altercation discovery of the baggie on Charles's person constituted relevant evidence under Fed. R. Evid. 401.

### ii. Admissibility Under Fed. R. Evid. 403 and 404(b)

In addition to arguing the drug evidence was irrelevant, Charles also claims that it was excessively prejudicial. Although Charles on appeal cites Rule 404(b), he does not make a specific claim that the evidence admitted did not serve a Rule 404(b) purpose; he instead argues that its prejudicial nature outweighed its probative value, an inquiry common to both Rule 403 and Rule 404(b) claims.

This Court accords a district court "great deference" in the balancing of probative value against unfair prejudice. United States v. Flemmi, 492 F.3d 79, 86 (1st Cir. 2005). The government argues both that the evidence was highly relevant to the narrative of the incident and also was not unfairly prejudicial because the court gave a detailed limiting instruction when the baggie was admitted, reminding the jury that Charles had not been charged with a drug crime and that any involvement he might have had with drugs did not mean he was guilty of assault. See United States v. Gilbert, 181 F.3d 152, 161 (1st Cir. 1999) (affirming balancing of probative value against prejudice where district court had given a limiting instruction). Further, the government stated in its closing argument, "this is not a drug case." It told the jury the drug evidence was relevant to whether the agents were truthfully testifying that they were doing their duty when they approached Charles, and it mentioned the evidence again when addressing Charles's argument of self-defense.

We have said that, "'[o]nly rarely -- and in extraordinarily compelling circumstances -- will [this Court], from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'" Flemmi, 402 F.3d at 86 (citation

omitted). There is no reason to reverse the district court's decision here.[1]

**B. Barron's Presence at Counsel Table**

A district court's decision on whether to sequester a witness is reviewed for abuse of discretion. United States v. Lussier, 929 F.2d 25, 30 (1st Cir. 1991). "Its decision will not be questioned absent a showing of prejudice." United States v. Jewett, 520 F.2d 581, 584 (1st Cir. 1975) (citation omitted).[2]

Charles makes two related claims in his argument that the district court abused its discretion in allowing Barron, the case agent, to sit at the government's counsel table: first, that it was error under Fed. R. Evid. 615 to allow him to sit at counsel table and second, that doing so was a violation of Charles's constitutional right to due process. Both arguments fail.

**i. Fed. R. Evid. 615**

Fed. R. Evid. 615 reads:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.

_____

[1]We add, moreover, that because there was no objection to the first reference to cocaine, and the review standard for that reference was plain error, which it certainly was not, the prejudicial impact of the second cocaine reference was modest.

[2]Defendant argues for the standard of review of harmless beyond a reasonable doubt, pursuant to Chapman v. California, 386 U.S. 18 (1967). However, as discussed below, because the court's decision to allow Barron to sit at counsel table was not an error, much less a constitutional error, this standard of review is not applicable.

-17-

> This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party who is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's case, or (4) a person authorized by statute to be present.

Charles argues that Barron was permitted to sit at counsel table only if he was indispensable to trying the case, but this is incorrect because Rule 615 provides an exception for the presence of case agent ("an officer or employee of a party which is not a natural person designated as its representative by its attorney"). See United States v. Machor, 879 F.2d 945, 953 & n.2 (1st Cir. 1989) (rejecting defendants' argument that court abused its discretion in not sequestering the government's case agent because "[t]he majority view . . . is that Fed. R. Evid. 615(2) has severely curtailed the discretion of the trial court to sequester the government's case agent," but noting that "[w]e are not holding . . . that the rule withdraws all discretion from the trial court to exclude a case agent in an exceptional case") (citations omitted); see also United States v. Casas, 357 F.3d 104, 26 (1st Cir.) (no error in permitting agent to sit at counsel table), cert. denied, 541 U.S. 1069 (2004).

Charles argues, incorrectly, that the case agent can sit at counsel table only if he is indispensable. Charles focuses on Rule 615(3), which provides for an indispensable person to sit at counsel table, but does not address Rule 615(2), a separate

-18-

provision providing for a case agent at counsel table without reference to indispensability. The government notes that the Senate Report on Rule 615 admits that it would be difficult to demonstrate that a case agent is indispensable. The report concluded:

> This problem [of whether to allow the case agent at counsel table] is solved if it is clear that investigative agents are within the group specified under the second exception made in the rule, for "an officer or employee of a party which is not a natural person designated as its representative by its attorney." It is our understanding that this was the intention of the House committee. It is certainly this committee's construction of the rule.

Fed. R. Evid. 615, Advisory Committee Notes, 1974 Enactment (quoting Sen. Rep. No. 93-1277 (1974)) (emphasis supplied).

Rule 615 is about the sequestration of witnesses, and its purpose is "to discourage and expose fabrication, inaccuracy, and collusion." Opus 3 Ltd. v. Heritage Park, Inc., 91 F.3d 625, 628 (4th Cir. 1996) (citations omitted). The concerns addressed by Rule 615 are not implicated here because, as the district court explained, Barron testified first before joining the government's attorney at counsel table. We find there was no abuse of discretion by the district court in its application of Rule 615 here.

### ii. Due Process

Charles argues finally that, apart from Rule 615, the district court failed to recognize the "prejudice inherent when a

-19-

victim sits at counsel table," claiming that Barron's presence at counsel table "improperly bolstered Agent Barron's credibility" and infused prejudice rising to a constitutional level into the proceeding. He challenges the fact that the district court's ruling focused primarily on Barron's identity as a case agent, not as the victim in the case, and questions the court's statement in its ruling that because defendant was sitting at his counsel table, there was "balance" with Barron's presence at government counsel table. Charles argues that due process requires that any activity that may pose "a threat to the 'fairness of the factfinding process' . . . be subjected to 'close, judicial scrutiny,'" Holbrook v. Flynn, 475 U.S. 564, 568 (1986) (quoting Estelle v. Williams, 425 U.S. 501, 503-04 (1976)), and that there was no compelling reason to have the case agent present at counsel table. Charles relies on Deck v. Missouri, 544 U.S. 622, 635 (2005), in which the Supreme Court reiterated its holding that when a court, without adequate justification, orders a defendant to wear shackles in front of the jury, that defendant need not demonstrate actual prejudice in order to make out a due process violation. Charles's reliance is misplaced here, however, as neither the Supreme Court nor inferior appellate tribunals, to our knowledge, have held that the presence of a victim case agent at counsel table is inherently prejudicial in the same way found by the Supreme Court in Deck, nor can we see any prejudice of that magnitude.

Charles contends that the presence of Barron at government counsel table implicitly bolstered the credibility of the agent's testimony, but he provides no convincing reasons to believe, on this record, that he suffered any prejudice as a result of Barron's presence at the table. See United States v. Williams, 604 F.2d 1102, 1115 (7th Cir. 1979) ("In the absence of any specific showing of prejudice to appellant . . . from the action of the trial court [in allowing case agent to sit at counsel table and testify after hearing other witnesses testify], we find no abuse of discretion."). The government argues that Barron's presence at counsel table in no way bolstered his credibility since, even though Barron testified that Charles had struck him and left a large bruise, the jury acquitted Charles of the indictment count alleging injury, instead convicting him only of the lesser included offense of assault with physical contact. Charles points to nothing indicating that Barron behaved at counsel table in such a way as to somehow evoke special sympathy for his status as a government victim.

The only case of which we are aware in this Circuit to discuss in any great detail the seating of a case agent at counsel table is United States v. Aganos, 853 F.2d 1, 4 (1st Cir. 1988). We held there that it was error for a district court, when requested, not to ask potential jurors on voir dire whether they thought a police officer was more likely to tell the truth than a

civilian.  We observed that the potential prejudice of the situation had been compounded by the court's allowing the case agent to sit at counsel table.  <u>Id.</u>  The witness's presence at counsel table had not been objected to, and we did not find plain error in his sitting at the table, noting to the contrary that "[i]t is understandable that in some cases trial counsel may need assistance other than an associate or paralegal.  Whether this should include a witness, particularly an important one, must be in the court's discretion."  <u>Id.</u> at 4-5.  We concluded, however, that "his presence at the table clearly accentuated the importance of the voir dire inquiry."  <u>Id.</u>  The instant case is easily distinguishable from <u>Aganos</u>.  Here, the district court asked the jurors during voir dire whether they had any bias for or against law enforcement officers and instructed them not to weigh more heavily any testimony by an officer.  We are satisfied that the court's decision in these circumstances to allow Barron to sit at counsel's table was well within its discretion.[3]

---

[3]We do not wholly endorse the district court's statement equating the case agent's presence at counsel table with that of the defendant at his own counsel table.  The government stands in a different position from the defendant in certain important respects.  It seems likely this comment may have stemmed from a similar comment in the Senate report to Rule 615, which draws a comparison between defendant's presence at his attorney's counsel table and the presence of a case agent at the government's counsel table: "[t]he practice [of allowing a case agent at counsel table] is permitted as an exception to the rule of exclusion and compares with the situation defense counsel finds himself in--he always has the client with him to consult during trial."  Fed. R. Evid. 615, Advisory Committee Notes, 1974 Enactment (quoting Sen. Rep. No. 93-

The government also points out that victims' rights statutes have allowed victims to sit in courtrooms (albeit not addressing the issue of their sitting at counsel table). See generally 18 U.S.C. § 3771(a)(3) (victim has "[t]he right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding"). See also § 3661(a)(5) (victim has right to confer with government attorney). While these statutes are perhaps of some help to the government's overall argument, they are not conclusive by themselves. The main point is that we see no general constitutional principle, such as the Deck court relied upon, rendering it impermissible for a case agent who was also the victim in the case from sitting at counsel table, nor, in the circumstances of this case, do we see any indication of specific prejudicing factors such as might, in an exceptional set of circumstances, prevent the district court from exercising its discretion in favor of allowing the case agent to sit there. As noted in Aganos, the matter is ordinarily one within the district court's sound discretion.

---

1277 (1974)). Whatever the force of this analogy in some respects, there are aspects of the government's position and authority which cannot be properly equated with that of defendant, making questionable any attempt at an exact parallel.

The court here carefully considered the issue of whether Barron's presence at counsel table could be prejudicial and took care to instruct the jury not to give his testimony greater weight than that of any other witness. In no way did it abuse its discretion in allowing Barron to remain at government counsel's table.

**Affirmed**.